ARTHUR E. RENARD *et al., as Partners, etc.,* v.
EDWARD BENNETT *et al.*

No. 15,247.   (93 Pac. 261.)

SYLLABUS BY THE COURT.

1. DEATH—*Presumption—Unexplained Absence—Inquiry.* Following *Modern Woodmen v. Gerdom,* 72 Kan. 391, 82 Pac. 1100, 2 L. R. A., n. s., 809, it is held that the inference of death to be derived from the unexplained absence of a person from his home for a period of seven years is, at best, only a presumption, and it cannot arise unless the absence remains unexplained after diligent inquiry is made of the persons and at the places where tidings of the absentee, if living, would most probably be had.

2. —— *Mere Absence Will Not Raise the Presumption.* The removal of a person to another part of the country, or his mere absence from a former home, where he has been unheard of for seven years, does not create the presumption of death.

3. —— *Diligent Inquiry Indispensable.* If the absentee left without intending to return and there is a change of domicil the fact that he has not communicated with, or is unheard of by, those remaining at his former home will not raise the presumption of death. That presumption does not arise until due inquiry has been made at his last known domicil and of the persons likely to know of his whereabouts, if living.

Error from Cloud district court; WILLIAM T. DILLON, judge.   Opinion filed December 7, 1907.   Reversed.

*Park B. Pulsifer,* and *Charles L. Hunt,* for plaintiffs in error.

*F. W. Sturges,* for defendants in error.

The opinion of the court was delivered by

JOHNSTON, C. J.: This was an action by Edward Bennett and Nettie Seyster, children of Orrin E. Bennett, to recover an undivided one-half interest in a tract of land lying near the city of Concordia, and they asked for partition as well as rents and profits.

The tract was formerly owned by D. W. Williams, who conveyed an undivided one-half interest to Orrin E. Bennett, and together they operated a brewery on the land until 1881, when the prohibitory law went into effect. About that time Williams removed to Missouri, while Bennett remained at Concordia and for a few years gave the property some attention. In a foreclosure proceeding against Williams a sale of the land was decreed, and the sheriff sold the same to the First National Bank of Concordia, conveying the property by a deed dated May 5, 1892. On December 21, 1900, the bank executed a deed purporting to convey the property to Renard Brothers, who are named as defendants in this action.

The theory of the action is that Bennett's interest in the tract had never been sold or transferred by any of the prior instruments or proceedings; that Bennett was dead and that his interest had passed to his children, who were his only heirs. When plaintiffs had introduced their testimony, which was largely devoted to an attempt to show the death of Orrin E. Bennett, its sufficiency was challenged by a demurrer to the evidence, which the court overruled, and at the end of the trial it was adjudged that Edward Bennett and Nettie Seyster each owned an undivided quarter interest in the property in question, the rents and profits were determined, and the partition of the property directed.

The only claim of the Bennett children to a share in the land in controversy is based on heirship, or inheritance from their father, and it therefore devolved upon them to establish his death. There was no direct proof of death as a fact, and to supply this lack they offered testimony which was intended to raise the presumption of death. The controlling question is, Were the circumstances proved sufficient to end the presumption of life and start the presumption of death? If not, then the demurrer to the evidence should have

54—76 KAN.

been sustained, as counsel for the Renard Brothers contend. When the action was brought Bennett had been absent from Concordia for more than fifteen years, but his mere absence from that city, although it extended for more than seven years, did not create the presumption of death. That presumption cannot arise from a change of residence or a removal from the place where the family or relatives reside. It is the unexplained absence from the absentee's last known residence or place of resort for the seven-year period that gives rise to the presumption. Nor is it enough that he has been absent and unheard of for this period, but the presumption can only arise after diligent and fruitless inquiry of persons and at places where news of him, if living, might likely be obtained.

The identical question was before the court in *Modern Woodmen v. Gerdom*, 72 Kan. 391, 82 Pac. 1100, 2 L. R. A., n. s., 809. Gerdom, an unmarried man, left his home in Kansas and went to California, where he obtained employment. After several letters to members of his family and some changes of location he ceased to communicate with them, and no tidings of him were received by his father or mother for more than seven years. He carried life-insurance in a fraternal society, which was claimed by beneficiaries, who insisted that he was dead. It appeared that only a limited inquiry as to whether he was living had been made by them, his father being the only witness who testified on the subject, and it was shown that he had not inquired of all the people and at all the places where news of the son, if living, might have been obtained. On this state of the case it was held that it was not a question as to whether there was some testimony to support the finding of death, but it was rather whether facts indispensable to start the presumption of death had been produced. Mr. Justice Burch, in a carefully prepared opinion, in speaking of the missing party and the circumstances which might give color to his absence, said that he "was a young, un-

married man, in good health, with the wander-lure upon him, trying his fortunes in a distant state, able to make his own way in the world, but whose circumstances had become such, or whose disposition toward his relatives had so far changed during his absence from home, that he no longer advised them, as he had been in the habit of doing, of changes in his affairs, of his plans, and of his movements from town to town." (Page 396.)   In treating of the inquiry which should be made and the preliminary proof necessary to start the presumption of death it was said:

"In order that the presumption of life may be overcome by the presumption of death there must be evidence, not merely of absence from home or place of residence for the period of seven years, but there must be a lack of information concerning the absentee on the part of those likely to hear from him, after diligent inquiry.   [Quoting authorities.]   It is conceived, however, that the character of the inquiry, the persons of whom it must be made and the place or places where it must be made are all to be determined by the circumstances of the case, with the obligation always upon the person who is to derive a benefit from the death of the absentee to exclude by the best evidence and with as much certainty as possible reasonable belief that he continues to live."   (Pages 396, 397.)

After referring to the fact that inquiry was not made of certain intimate friends with whom the absentee might have communicated the opinion proceeded:

"All those persons who in the ordinary course of events would likely receive tidings if the party were alive, whether members of his family or not, should be interrogated, and the result of the inquiry should be given in evidence, or the testimony of the parties themselves should be produced at the trial.   .   .   . Any word received by any one who might naturally be expected to hear at any time within the seven-year period destroys the presumption of death, and unless the resources of this field of information have been exhausted an allegation of death cannot successfully be sustained."   (Page 398.)

The principles applied in that case control the present disposition of the one before us. While Bennett has been absent from Concordia for a long period of time, it is clear that there has not been the diligent inquiry for him essential to the presumption; that is, the inquiry has not exhausted "all patent sources of information, and all others which the circumstances of the case suggest." (*Modern Woodmen v. Gerdom*, 72 Kan. 391, syllabus.) He took his departure from Concordia about 1890, leaving a family consisting of a wife and three children, one of whom has since died, and also an aged mother. A married sister of his lives in Concordia, another married sister in Kansas City, Mo., and a half-brother near Frankfort, Kan. It is in testimony that he had a passion for gambling, one of the witnesses stating that "that is really what he lived for," and that he gambled whenever "he had the money to gamble with." Before he left he had become estranged from his wife, and, as one witness expressed it, he "wanted to get away from the family." His relations with his mother were friendly, but he did not want to live in the same town with his wife. He went west, and within six months after leaving he wrote a letter to his mother from a town on the Pacific coast stating that he was in good health and was just about to sail on a vessel from that port to one in Alaska. About the same time he wrote a similar letter to his son William, who afterward died in the Philippines. His wife, who died in 1894, never received a letter from him, nor did he ever write to his surviving children, Edward and Nettie.

There was a rumor that he had been seen in a town in the state of Washington by some one who was not within speaking distance, and his sister wrote a letter addressed to him at that place but received no reply, and, although there was a return address on the envelope, the letter was never returned to her. When his mother died, which occurred about a year after he left Concordia, notices of action to be taken in the

Renard v. Bennett.

probate court toward a settlement of her estate were published in the newspapers, and copies of these papers were mailed to him at the town where rumor said he had been seen. The sending of the letter and the newspapers was the extent of the inquiry made to find Bennett in his new home in the West. Rumors of his having been in Kansas City, Mo., reached some of the members of his family, but they did not appear to have any foundation. It does not appear that his children, who are claiming his property as an inheritance, ever made any effort to find their father. The testimony of his brother, who lives in Kansas, was not produced, nor was that of his sister who lives in Kansas City, Mo., nor of the brother-in-law, a former partner, who still resides at the last-named place. Moreover, it was not shown that any inquiry was made at the place from which the letters to his mother and son were written. His letter to his mother gave the name of the place on the coast, which the witnesses could not remember, and that furnished a clue from which those interested might have learned something of him—the name of the ship upon which he sailed, as well as his destination and subsequent domicil in Alaska. It does not appear that any inquiry was made in Alaska, nor any effort to learn from sailing lists, public records, or other sources of information, what had become of the absentee.

According to his own statement his departure from his Kansas home was final and permanent. It was a case of a change of domicil, and therefore little can be based upon the fact that he did not return to Concordia. Since the removal was permanent and without an intention to return, a more extended inquiry should have been made. It should have extended to the new home. It is absence from his last known domicil that gives rise to the presumption. It was said of the absentee in the Gerdom case, *supra*, that "there is nothing to indicate that a purpose to return was bound up with his leaving." (Page 399.) Here

there was an avowed purpose to stay away from Concordia, and in the letters received from him there was no hint of an intention to return. It is quite unlike a case where there is a sudden disappearance by one of good habits, who is successful in business, is respected by his neighbors, and has a good home and pleasant relations. There were no attachments to draw Bennett back to Concordia—no business interests, and the only property left was encumbered and unprofitable.

There is no proof of illness, disease, dangerous occupation, or disposition to suicide, nor yet that he had been exposed to any specific perils likely to have ended his life, to support the presumption. On the other hand it does appear that he was a healthy, vigorous man, in middle age, as there was testimony that he was from 55 to 59 years of age at the time of the trial, and besides there is an absence of any special circumstances inconsistent with the continuation of life. The patent defect in the testimony, however, is the lack of diligent inquiry. To establish a death and the right of inheritance plaintiffs rely only upon the presumption arising from absence. The inference of death to be derived from unexplained absence is, at most, only a presumption, and it cannot arise unless the absence remains unexplained after diligent inquiry is made of the persons and at the places where tidings of the absentee, if living, would most probably be had. (*Modern Woodmen v. Gerdom,* 72 Kan. 391, 82 Pac. 1100, 2 L. R. A., n. s., 809; *Iberia Cypress Company v. Thorgeson,* 116 La. 218, 40 South. 682; *Barr v. Chapman,* 30 Weekly Law Bulletin, 264; *Burnett et al. v. Costello,* 15 S. Dak. 89, 87 N. W. 575; *Hitz v. Ahlgren,* 170 Ill. 60, 48 N. E. 1068; *Francis, Appellant, v. Francis et al.,* 180 Pa. St. 644, 37 Atl. 120, 57 Am. St. Rep. 668; *Posey v. Hanson,* 10 App. Cases, D. C. 496; *Latham v. Tombs,* 32 Tex. Civ. App. 270, 73 S. W. 1060; 2 Greenl. Ev., Lewis's ed., § 278*a*; 13 Cyc. 301.)

Diligent inquiry, as held in the Gerdom case, required the interrogation of the members of Bennett's

family, with whom he might have communicated, but it appears that there was a failure to produce the testimony of a sister and a brother which was accessible and could easily have been obtained. The rule of that case also required that reasonable inquiry should have been made at the place on the Pacific coast, where Bennett was when the letter to his mother was written, and also at his last domicil or places of resort in Alaska, which might have been ascertained by inquiry. Until diligent inquiry is made and the sources from which information is likely to be obtained have been exhausted the presumption of death does not arise, and hence there was error in overruling the demurrer to plaintiffs' evidence.

The judgment is therefore reversed and the cause remanded for further proceedings.