No. 34,663

MARY WHITE, as Administratrix of the Estate of Andrew Lee Jackson, *Appellee*, v. THE METROPOLITAN LIFE INSURANCE COMPANY, *Appellant*.

(100 P. 2d 691)

Opinion field April 6, 1940.

*Edwin S. McAnany, Thomas M. Van Cleave, Willard L. Phillips, Bernhard W. Alden, Patrick B. McAnany* and *Thomas M. Van Cleave, Jr.*, all of Kansas City, for the appellant.

*Thomas H. Finigan*, of Kansas City, for the appellee.

The opinion of the court was delivered by

HARVEY, J.: This was an action on a life insurance policy. The jury answered special questions and returned a general verdict for plaintiff. Defendant has appealed and contends there was no substantial competent evidence to sustain the verdict. · This was raised by a demurrer to the evidence and by various post-verdict motions.

In the petition, filed October 1, 1937, plaintiff alleged that she was the administratrix of the estate of Andrew Lee Jackson; that on December 15, 1919, defendant issued to Andrew Lee Jackson a policy of insurance on his life for $445, the beneficiary designated therein being his executor or administrator; that all premiums under the policy have been paid; that more than ten years before the filing of the petition the insured disappeared and has not been heard of since; that plaintiff made inquiry to ascertain the whereabouts of insured, but was unable to find him; that defendant was notified of his disappearance and it made an effort to locate him, without avail, and that notwithstanding the fact that the insured is legally dead defendant refused to pay plaintiff the proceeds of the policy. Defendant's answer contained a general denial, except that it admitted its corporate existence, and that it issued the policy sued on.

Plaintiff testified that she is a half-sister of the insured and the administratrix of his estate; that the premiums on the policy have been paid; that she last saw the insured in the fall of 1923 in Kansas City, on the Missouri side, where he was rooming at a hotel near Twelfth street; that she did not know the people with whom he roomed; that before the time she last saw him he visited her "just every now and then; maybe once a week; maybe once every two

weeks; something like that." Plaintiff's father was Gilbert Jackson, from whom her mother was divorced, and she then married Stewart Jackson, who is the father of Evenhart Jackson and Andrew Lee Jackson, the insured. Plaintiff is about six years older than the insured. Her mother and Stewart Jackson raised all three of the children. Their home was near Sedalia, Mo. Plaintiff came to Kansas City from Sedalia in 1917. Stewart Jackson died and plaintiff's mother and the two boys went to Kansas City, Mo., about 1919, or before. They left no near relatives at Sedalia. The insured had a grade-school education and could read and write readily. At Kansas City he got a job at a hotel as bus boy, and later worked at a delicatessen. The insured lived with his mother, who kept house for him, and worked until her death in May, 1923. He was very close to his mother and when she died he took a very dark outlook on life. He broke up housekeeping and went to live in a room at a hotel. Plaintiff did not know where the insured was working in 1925, nor for sure where he roomed. She did not know when he left Kansas City. The insured was a single man, so far as the plaintiff knew he was in good health, and she knew of no disease of any kind which he had. In 1933 plaintiff went to the company's Kansas City, Kan., office and talked with the manager, told him of the disappearance of her brother, and he gave her a blank to execute before a notary public, which she did on December 21, 1933. This statement is as follows:

"1. State full name of insured: Andrew Lee Jackson. Present age: 32. 2. Give the exact date of alleged disappearance: Disappeared in 1925. 3. Where and with whom did insured reside at time of disappearance? Lincoln Hotel, K. C. Mo., 13th and Woodland Ave. 4. What were the circumstances under which the insured disappeared? Give full particulars: Seemed to worry and brood over his mother's death. 5. What effort was made to locate the insured? Give full particulars: All letters in possible attempts to locate him were returned undelivered. 6. How long after the disappearance was an effort made to locate the insured? Several months afterwards. 7. Were the police authorities notified? (If so, state when and result.) No. 8. Has the insured been seen or heard from since disappearance? Give particulars: No, except one letter about 3 weeks after disappearance which gave no address. 9. What was the physical and mental condition of the insured at time of disappearance? Good. . . ."

Later plaintiff received a copy of a letter written by defendant to the manager of its Kansas City district office on July 17, 1934, on the subject of the disappearance of Andrew Jackson, which was introduced in evidence. It reads:

"Again interview the claimant, and inform her that in view of the insured's present age, the probability of life is stronger than that of death. Please make the offer again, informing her that if at any time, after she accepts our offer, she is able to furnish us with evidence of death of our insured, such death having occurred prior to the date of settlement, we will gladly reopen the case for a consideration of payment of the claim in full, less the amount received. . . ."

After the insured left Kansas City plaintiff received a letter from him, written from Gary, Ind., which had a return address on it. She answered this, but received no other mail from him. Plaintiff introduced a copy of a letter received by the state insurance department, written by defendant July 28, 1936, which was in reply to a letter of the department of July 14, pertaining to this policy and which contained the following:

"This person's disappearance in June, 1925, was first brought to our attention on September 16, 1933, by our district office, who wrote us in behalf of Mrs. Mary White, sister of the insured. The matter was placed under thorough investigation and it was disclosed that the insured had in 1927 communicated with a brother, Evenhart Jackson, and that the insured was at that time residing in Chicago. The circumstances under which the insured disappeared did not in our opinion give rise to a presumption of death and we, therefore, offered to purchase the policy for its full reserve value of $55. This offer was refused in August, 1934. . . .

"The present reserve under the policy, assuming that the premiums are paid to date, is $65.35. We are instructing our manager to again offer the reserve to Mrs. White with the provision that the acceptance will not prejudice her right to reopen the case at a future date should evidence be disclosed that the insured died prior to the date of acceptance. . . ."

Hazel Roy, a witness for plaintiff, testified she became acquainted with the insured in 1917; that she saw him about once a week and was keeping company with him; that they started keeping company about 1918 or 1919 and continued until he left in the year 1923; that the last time she saw him was in Kansas City, Mo., in the fall of 1923. He was then living in a hotel across from Woodland, Kansas City, Mo. He had lived there about three or four months. Before that he had been living with his mother. The last place she knew of his being employed was for a private family as a chauffeur, where he had worked for about a year. Before that he worked in a grocery store. She had no falling out with him before he left Kansas City and knew of no particular reason for his leaving. About four or five months after he left Kansas City she received a letter from him, which she destroyed. It was written from a hotel in Chicago where he stayed. The letter said he was in Chicago and everything

was fine. That is the only letter she received from him. About 1929 or 1930 she went to Chicago. She had a hotel address where he had lived there. She went to that address and he was not there. She went to a pool hall down the street from the hotel and could not find out anything there.

Evenhart Jackson, a witness for plaintiff, testified that he is a brother of Andrew Lee Jackson; that he last saw him about 1924 or 1925. At that time he was living at a hotel at Twelfth and Woodland, or it might have been at Twelfth and Euclid, Kansas City, Mo. He lived in that hotel about two or three years. He had lived with · his mother until she died, and was with her at her last illness and attended her funeral. The witness and insured got along fine and were happy. They went to dances and to pool halls together, and saw each other every few days. After his mother died witness married and acquired a home of his own. His interests changed from what they had been before. Sometimes witness and his wife and insured would go to dances together. Insured actually lived in a hotel on Euclid; he did not live on Woodland. He lived in a room at the hotel two or three years after their mother died, in 1923. When he left he took all his belongings, except a "chifforobe." The witness finally fixed the date insured left Kansas City as in 1925.

"Q. Do you know of any reason for him leaving Kansas City at that time? A. No; I think he just got tired here, that is all I know for him leaving; that he just got tired of Kansas City and left, that is all I know. . . . Q. Do you know of your own knowledge any reason? A. No; he used to say that he would like to go East. I don't know of any reason for him to go, but he said he would like to go East."

The insured always spoke as if he wanted to go East, even while his mother was living. When the insured left, Indiana was his first destination. He first went to Gary, Ind., and then to South Bend, and then to Chicago. Witness did not receive any letter from him until he reached Chicago. The witness thought he went to Chicago because "he wanted to settle down." The witness received the first letter from him from Chicago in 1925. It had been destroyed, but in it the insured said he liked it up there fine, was getting along fine, and wanted witness to come up there with him. The witness answered and told him he was getting along fine at that time at home. The witness later wrote the insured several letters; one of them was registered. None of them came back. He then wrote the chief of police at Chicago and asked for information concerning his brother and received a letter asking for a picture, which he sent, but never

received any further information from the Chicago police department. Witness made inquiries concerning him at Kansas City of several folks that had been out with him, told them where he used to live there, that he had gone to Chicago and had not come back, and asked if they had seen him, and they said no. The witness received a letter or two from him from Chicago. In the last letter he said he liked it up there fine and wanted witness to come and see him. The witness wrote back that because he had his home here and his job that he would not be able to go up there and stay with him, and he never heard from insured after that.

Defendant's demurrer to plaintiff's evidence and its motion for an instructed verdict were overruled.

Answering special questions, the jury found that no inquiry had been made to locate insured at Sedalia, Mo., or at Gary or South Bend, Ind. That plaintiff personally made inquiry to locate insured by letter to Chicago and friends in Kansas City. That no investigation had been made of police records, or of court records, or of coroners' records, or of records of burial, in any city or place. That the insured communicated with his brother in 1927. That the search made for insured thereafter was by Miss Roy in 1929 or 1930 by visit to a Chicago hotel and pool room, and by the insurance company from 1933 to 1937. That insured left Kansas City with the intention of changing his place of abode, and took with him all his personal effects, except a chifforobe. That the last known home or domicile of insured was a hotel in Chicago; that inquiry was made to locate him there by registered letter, other letters, and a personal visit. That plaintiff and her immediate relatives made investigation to locate insured by inquiry of his friends and associates at a hotel and pool hall in Chicago and friends in Kansas City; that they made no such inquiry of the immediate relatives of the insured; that they had correspondence concerning the whereabouts of insured, to hotel in 1927, and later to Chicago police department—date not certain—and from insurance company, July 17, 1934. That inquiries concerning the whereabouts of insured were made personally to Kansas City police department and by letter to Chicago police department. That there was a cessation of correspondence from insured to plaintiff and other relatives in Kansas City, who last heard from him in 1925 and 1927. That in connection with the investigation Miss Roy went to Chicago and inquired at a hotel and pool hall there.

Defendant moved to strike out the latter part of the jury's answer which found that the insurance company had made an investigation from 1933 to 1937. While perhaps a minor point, we think the motion should have been sustained. We find no evidence in the record indicating the insurance company made any investigation of the whereabouts of the insured after its letter of July 17, 1934. Indeed, that indicates the investigation had been made in the fall of 1933, when it was discovered that the insured had communicated with his brother in 1927. Defendant also moved for judgment in its favor on the answers to the special questions notwithstanding the general verdict. Appellant's principal contention, that the evidence was insufficient to sustain the verdict, inheres in its demurrer to plaintiff's evidence and its motion for a directed verdict, and in its motion for judgment on the answers of the jury to the special questions. While the effect of our conclusion is that each of these should have been sustained, since the case was submitted to the jury and special questions answered, it may be less confusing to treat the motion for judgment on the special findings. We attach no special significance to the fact that the jury found there had been no inquiry to locate insured at Sedalia, Mo., or at Gary or South Bend, Ind. Other evidence indicates no immediate relatives were left in the vicinity of their old home near Sedalia and he was at Gary and South Bend, Ind., but a short time. Neither do we place any special significance on the finding that the plaintiff made no inquiry of the immediate relatives of the insured, since the only immediate relatives disclosed by the evidence were plaintiff and the brother, Evenhart Jackson.

The jury found that the insured left Kansas City with the intention of changing his place of abode and took with him all his personal effects except a piece of furniture in his room, and there is no evidence that he later claimed that, or attempted to do anything with it. In such a situation, unavailing inquiries at Kansas City raised no presumption of the death of the insured. In 16 Am. Jur. 26 the rule is thus stated:

"If a person removes from his domicile to establish a home for himself in another state or country, at a place well known, such removal is a change of residence only, and absence from the former domicile does not raise a presumption of death."

And in 17 C. J. 1170 it is said:

". . . The absence of a person from his former place of residence for seven years does not raise a presumption of his death where it appears that he had moved to another place and there located. . . ."

In *Renard v. Bennett*, 76 Kan. 848, 93 Pac. 261, it was held:

"The removal of a person to another part of the country, or his mere absence from a former home, where he has been unheard of for seven years, does not create the presumption of death." (Syl. ¶ 2.)

It is clear from the record that plaintiff was a young man, about 25 years of age, unmarried, in good health, who for several years had contemplated going east from where he lived, and that he did in fact, as the jury found, leave Kansas City with the intention of changing his place of abode and making his home at some other place. He did go to Chicago, as his brother thought, "to settle down." He was known to have been there approximately two years. During that time he had some correspondence with his brother at Kansas City. In the last letter he wrote his brother he urged the brother to come to Chicago to visit him. The brother wrote that he could not do so on account of his home and his work. The brother's later letters to the insured were not returned, although one of them was registered. But they were not answered. This tends to show that the insured received the letters and did not care to keep up the correspondence further. Plaintiff received but one letter from him, and that was written from Gary, Ind., apparently soon after he left Kansas City. Miss Roy received but one letter from him, written from a hotel in Chicago four or five months after he had left Kansas City. She destroyed that letter, and the record does not show that she answered it. So, soon after he left Kansas City he had severed his correspondence relations with both the plaintiff and Miss Roy, and approximately two years later severed them with his brother. The jury was unable to locate the time when the insured's brother wrote the Chicago police department. Their answer to one of the special questions would indicate that it was prior to the time the brother received the last letter the insured wrote him, but it was quite a perfunctory investigation at the best. It was not followed up, and there is nothing to indicate that the police department at Chicago made any serious effort to locate the insured. The visit of Miss Roy to the hotel and pool room in Chicago in 1929 or 1930 is of even less importance. In short, there is no evidence of any worth-while search or inquiry for the insured at Chicago.

The presumption of the continued life is strong, particularly in a young man, who was in good health, as was the insured in 1925, and it cannot be overcome by a presumption of death based upon a

casual or superficial inquiry. (See *Ryan v. Tudor,* 31 Kan. 366, 2 Pac. 797; *Modern Woodmen v. Gerdom,* 72 Kan. 391, 82 Pac. 1100; 77 Kan. 401, 94 Pac. 788; *Renard v. Bennett,* supra; *Caldwell v. Modern Woodmen,* 89 Kan. 11, 130 Pac. 642; *Mackie v. United Workmen,* 100 Kan. 345, 164 Pac. 263.) Appellee compares the evidence in this case with that of some of the cases above cited and argues that the evidence was sufficient to raise a prima facie presumption of death, and whether it was sufficient to overcome presumption of continued life was one of fact for the jury. We think the evidence far short of sustaining that view, particularly when it is limited, as it must be, to the inquiry made at Chicago, to which place the insured had removed and established his abode. We deem it unnecessary to quote at length the evidence from our prior decisions and compare that with the evidence here.

The judgment of the court below is reversed with directions to sustain defendant's motion for judgment in its favor on the answers of the jury to special questions.